UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
LOVERBOY INC.,                                      )
                                                    )
                              *Plaintiff*,          )
                                                    )
            v.                                      )      Case No. 21-10758
                                                    )
NIGHT SHIFT DISTRIBUTING, LLC,                      )
                                                    )
*and*                                               )
                                                    )
ROBERT BURNS.                                       )
                                                    )
                              *Defendants*.         )
_____)

## COMPLAINT

Loverboy Inc. ("Loverboy"), by and through counsel, brings this action against Defendants Night Shift Distributing, LLC ("Night Shift"), and its co-founder and President Robert Burns ("Burns"), seeking monetary damages, among other relief, for various acts of fraud by Night Shift and Burns, and in the alternative, for breach of contract against Night Shift.  In support of its action, Loverboy alleges as follows:

1.      This is an action by Loverboy, a start-up supplier of alcoholic beverages for the growing sparkling beverage market, against Night Shift, an alcoholic beverages distribution company, and Burns its co-founder and President, arising out of their efforts to induce Loverboy and other small businesses, like Loverboy, into false, unfair, deceptive and exploitative distribution agreements.

2.      Night Shift and its principals, including Burns, carried out this scheme by marketing themselves as friendly to manufacturers and other suppliers, like Loverboy. Night

Shift promised to waive a specific provision of the Massachusetts Liquor Control Act offering Night Shift protections under Massachusetts' alcohol franchise law, and to more generally waive its rights, as they might exist, under Massachusetts' alcohol franchise laws governing alcoholic beverages distribution. But all the while, Night Shift and Burns intended instead to zealously enforce those laws to the detriment of Loverboy and other manufacturers and suppliers, like Loverboy.

3.      Night Shift's and Burns' false, misleading, unfair, and deceptive practices in promising to waive the Massachusetts alcohol franchise law to induce Loverboy into a contractual relationship and then seeking to enforce those laws constitutes a fraudulent bait and switch entitling Loverboy to damages, treble damages, and its attorneys' fees.

## The Parties

4.      Plaintiff Loverboy Inc., is a Delaware corporation with its principal place of business in New York City.

5.      Night Shift Distributing, LLC, is a limited liability company organized under the laws of the Commonwealth of Massachusetts and with a principal place of business in Chelsea, Massachusetts.

6.      Robert Burns is a co-founder and the President of Night Shift.  Burns is a natural person domiciled in the Commonwealth of Massachusetts.

## Jurisdiction and Venue

7.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000 and complete diversity exists between plaintiff and defendants.

2

8.      The Court has personal jurisdiction over Defendant Night Shift on the basis that Night Shift is organized under the laws of the Commonwealth of Massachusetts and regularly transacts business in the Commonwealth of Massachusetts

9.      The Court has personal jurisdiction over Defendant Burns on the basis that Burns is domiciled in the Commonwealth of Massachusetts and engaged in the acts set forth herein in the Commonwealth of Massachusetts.

10.     Venue is appropriate according to 28 U.S.C. § 1391, as the defendants reside in this district and a substantial part of the events giving rise to the claims occurred in this district.

**The Distribution Agreement**

11.     Loverboy produces a line of alcoholic beverages that are carbonated drinks, including Loverboy Spritz cocktails and Loverboy Sparkling Hard Tea drinks.

12.     Loverboy's Chief Executive Officer and Founder is Kyle Cooke ("Cooke").

13.     Loverboy's Chief Operating Officer is Nicholas Califano ("Califano").

14.     On August 1, 2019, Night Shift transmitted its proposed Distribution Agreement to Loverboy. *See* e-mail, with attachment, dated August 1, 2019, a copy of which is attached hereto as **Exhibit 1(a)-(b)**.

15.     On or about October 8, 2019 (the "Effective Date"), Loverboy and Night Shift entered into a Distribution Agreement (the "Agreement") for Night Shift to distribute Loverboy's products in the Commonwealth of Massachusetts.  A true and correct copy of the Agreement is attached hereto as **Exhibit 2**.

16.     The Agreement was drafted by Night Shift.

17.     The Massachusetts Liquor Control Act ("LCA"), Massachusetts General Laws chapter 138, governs the lawful activities of Loverboy and Night Shift relative to the sale and

27092836v.1

other activities in Massachusetts with alcoholic beverages.   The LCA contains a provision that offers specified protections to Massachusetts licensed wholesalers/distributors of alcoholic beverages. Mass. Gen. Laws chapter 138, §25E.  In the beverage alcohol industry, this Section 25E is commonly referred to as the Massachusetts alcohol franchise law.

18.     The Massachusetts Supreme Judicial Court has described the impact of Section 25E as follows:

> G.L. c. 138, § 25E … makes it an unfair trade practice for a manufacturer (or other supplier), absent good cause, to refuse to sell a brand of alcohol to a wholesaler if the manufacturer has made regular sales of such brand to the wholesaler during the preceding six-month period.[4]
> …
>
> FN 4.    General Laws c. 138, § 25E, provides as follows:  "It shall be an unfair trade practice and therefor[e] unlawful for any manufacturer, winegrower, farmer-brewer, importer or wholesaler of any alcoholic beverages, to refuse to sell, except for good cause shown, any item having a brand name to any licensed wholesaler to whom such manufacturer, winegrower, farmer-brewer, importer or wholesaler has made regular sales of such brand item during a period of six months preceding any refusal to sell.  Good cause as used herein shall be limited to the following conduct: (a) disparagement of the product so as to impair the reputation of the brand owner or the brand name of any product, (b) unfair preferment in sales effort for brand items of a competitor, (c) failure to exercise best efforts in promoting the sale of any brand item, (d) engaging in improper or proscribed trade practices, or (e) failure to comply with the terms of sale agreed upon between supplier and wholesaler."

*Heublein, Inc. v. Capital Distribution Company, Inc.,* 434 Mass, 698, 699-700 (2001).

19.     The Massachusetts Appeals Court years ago acknowledged that Section 25 has been described as "protectionist" legislation, enacted, in part, "to redress economic imbalances in the relationship[s between] wholesalers and their suppliers." *Pastene Wine & Spirits Co. v. Alcoholic Bevs. Control Commn.,* 401 Mass. 612, 618-619 (1988) (internal citations omitted); *Heineken U.S.A. v. Alcoholic Bevs. Control Comm'n*, 62 Mass. App. Ct. 567, 572 (2004); *see Seagram Distil. Co. v. Alcoholic Bevs. Control Commn.,* 401 Mass. 713, 716-717 (1988). Obligations imposed by c. 138, s. 25E, are particular to a supplier. *See Charles E. Gilman &*

*Sons, Inc. v. Alcoholic Bevs. Control Commn.,* 61 Mass. App. Ct. 916, 917-918 (2004); *Brown-Forman Corporation v. Alcoholic Beverages Control Commission,* 65 Mass. App. Ct. 498, 499 (2006).

20.     Section 2.2 of the Agreement titled "Termination by Either Party" was a critical and material term to Loverboy and to Cooke.

21.     Section 2.2 of the Agreement states in full:

Notwithstanding Section 25E of Chapter 138 of the Massachusetts General Laws ("Section 25E"), this Agreement may be terminated by either party at any time, without cause, upon 14 days' written notice if prior to the date 180 days after the Effective Date, and upon at least 30 days' written notice thereafter.

22.     Similarly, Section 2.5 of the Agreement titled "Effect of Termination" was also a critical and material term to Loverboy and Cooke:

Upon a termination by the Company in accordance with this Section 2, the Company may refuse to sell any Products to the Distributor, notwithstanding Section 25E. The Distributor waives any notice of discontinuance of sale requirement provided by Section 25E to the extent permitted by law. If upon a termination by the Company in accordance with this Section 2, the Company chooses to file a notice of discontinuance of sale with the Massachusetts Alcoholic Beverages Control Commission (the "ABCC") pursuant to Section 25E, the Distributor agrees to not appeal to the ABCC for a hearing on such notice. If the Distributor breaches the previous sentence and the ABCC enforces a continuing distribution relationship notwithstanding the terms of this Agreement, then the Distributor shall no longer be the sole and exclusive distributor for the Products in the Territory and any resulting distribution relationship shall be non-exclusive in the Territory unless otherwise agreed upon by the Company and the Distributor.

23.     These termination provisions represented material terms to Loverboy, because Section 25E imposes significant restrictions on the ability of an alcoholic beverage manufacturer and other suppliers, like Loverboy, to terminate its relationship with a distributor.

24.     Indeed, these contractual termination provisions were the most important factor in Loverboy's decision to enter into the Agreement with Night Shift. Absent these provisions, Loverboy would not have entered into the Agreement with Night Shift.

25.     The contractual termination provisions in Section 2.2 and Section 2.5 of the Agreement were included in each version of the Agreement drafted and presented to Loverboy by Night Shift, including the initial version of the Agreement proposed by Night Shift on August 1, 2019. (Ex. 1(b); Ex. 2).

### Night Shift's Inducement of Loverboy

26.     Burns initiated an unsolicited first contact to Cooke by direct message on July 31, 2019, soliciting Loverboy's distribution business. *See* **Exhibit 3**.

27.     During a telephone discussion the following day, Burns, Cooke, and Califano discussed Night Shift's proposal to distribute Loverboy's products in Massachusetts.  During this call, Burns expressly stated that Night Shift would waive the application of Section 25E in its agreement to distribute Loverboy's products.

28.     This promised waiver of Section 25E was a central point of Burns' solicitation of Loverboy.  Indeed, Burns told Cooke and Califano, "If you guys [Loverboy] outgrow us and you need to leave, no questions asked, just give us 30 days' notice and we'll chalk that up as a success."   During this same telephone conversation, Burns told Cooke and Califano that Loverboy has "nothing to lose" by entering into a distribution agreement with Night Shift, since Loverboy would remain free to terminate Night Shift at any time, for any reason, without liability or compensation.

29.     Burns, Cooke, and Califano had additional telephone discussions on August 21, 2019, and between September 23, 2019, and September 29, 2019.  During these conversations,

6

Burns reaffirmed Night Shift's agreement to waive Section 25E and its willingness to allow Loverboy to terminate the Agreement at any time, for any reason, without liability or compensation.

30.     The promises made by Burns and Night Shift were consistent with Cooke's and Califano's understanding of Burns' lobbying efforts on behalf of suppliers and with Burns' public statements about 25E and supplier-distributor relationships in Massachusetts.

31.     Loverboy made the decision to enter into the Agreement as the result of several direct conversations with Burns.

32.     Indeed, Night Shift markets itself to new and developing manufacturers and other suppliers by promising not to enforce certain of the Massachusetts alcoholic beverages distribution laws governing the relationships between manufacturers and other suppliers and distributors, including Section 25E.

33.     For example, in a March 14, 2017 article on Bizjournals.com, it was reported that Night Shift does not lock manufacturers and other suppliers into long-term contracts and allows them to terminate simply by providing the agreed upon notice.  The report also quoted Burns referencing the growth of Night Shifts' business because of its "denouncing" the so-called Massachusetts alcohol franchise laws, specifically section 25E, and explaining the company's philosophy:  Night Shift targets small, start-up and up-and-coming manufacturers and other suppliers for distribution agreements by offering freely terminable agreements ("I would definitely say NSB publicly denouncing the 25E franchise law has brought in these smaller brewers.").  A true and correct copy of this article is attached as **Exhibit 4**.

34.     In the article, Burns went on to single out Section 25E specifically, and acknowledged the commercial impact of its waiver: "I would definitely say that [Night Shift]

7

publicly denouncing the 25E franchise law has brought in these smaller brewers that wouldn't otherwise be comfortable selling beer in the state." (Ex. 4).

35.     Additionally, at a conference panel titled "Distribution Disruptors" in June 2017, Burns repeated this corporate mantra about not enforcing Massachusetts' so-called alcohol franchise laws in its relationships with suppliers, like Loverboy.  A video of this panel discussion is available to the general public via YouTube.[1]

36.     Among other things, Burns stated at the "Distribution Disruptors" conference that "if we [as a distributor] are not succeeding … or we change our vision or the brewery changes their vision, lets part ways amicably and move on," as opposed to requiring that suppliers comply with burdensome franchise laws like Section 25E. *See* Fn. 1, at 8:25 – 10:03.

37.     Also as the "Distribution Disruptors" conference, Burns explained that a supplier should be able to terminate its distributor by providing notice and nothing more, stating that such a termination is "no different than if Whole Foods wants to stop buying Night Shift beer tomorrow." *See* Fn. 1, at 43:25 – 43:50.

38.     Likewise, on its website Night Shift markets itself to manufacturers and other suppliers with the promise that there are "[n]o lifetime contracts" and "archaic franchise laws will be ignored."   A true and correct screenshot of the Night Shift website is attached as **Exhibit 5**.

39.     It was in this context that Burns told Cooke and Califano that any distribution agreement between Loverboy and Night Shift would include language waiving any and all of Night Shift's rights under Section 25E.

---

[1]     Panel, Distribution Disruptors (https://www.youtube.com/watch?v=NWvPsJ-2qzw).

27092836v.1

40.     Loverboy would not have entered into the Agreement with Night Shift, but for Burns' and Night Shift's promises to waive in the Agreement the protections that might exist under Section 25E, and not to enforce against Loverboy Section 25E.

41.     On December 1, 2020, Loverboy terminated the Agreement with Night Shift in accordance with Section 2.2 of the Agreement.

**Night Shift Breached the Agreement by Failing To Provide Agreed Upon Services**

42.     During the term of the Agreement and prior to January 1, 2021, the effective date of Loverboy's termination, Night Shift failed to satisfy its obligations according to the Agreement in several ways.

43.     Night Shift failed to use commercially reasonable efforts to provide Loverboy products to customers in its territory in accordance with Section 3.1 of the Agreement.

44.     Night Shift failed to use commercially reasonable efforts to execute Loverboy's marketing programs in accordance with Section 3.2 of the Agreement.

45.     Night Shift failed to use commercially reasonable efforts to maintain a business organization and equipment reasonably sufficient to market and distribute Loverboy's products in its territory in accordance with Section 3.2 of the Agreement.

46.     Night Shift's failures included its strategy to deliver large volumes of Loverboy products to a small number of retail accounts.

47.     Many retailers who wanted to sell Loverboy products were unable to meet the unreasonably high minimum order requirements implemented by Night Shift.

48.     Many retailers who placed orders with Night Shift for Loverboy products were required to wait an unreasonable amount of time to receive deliveries; and when Night Shift eventually delivered Loverboy products to these retailers, it delivered unreasonably large orders.

27092836v.1

49.     Night Shift failed to provide reasonable and customary service to retailers selling Loverboy products.

50.     Loverboy raised its concerns to Night Shift on many occasions.  On one such occasion, Night Shift's Brand Manager refused to reconsider Night Shift's distribution strategy for Loverboy products and explained Night Shift's position that it is not responsible for anything other than delivering product.

**Night Shift Continued to Breach the Agreement After Termination**

51.     On or about December 1, 2020, Loverboy transmitted a termination notice to Night Shift exercising its rights under Section 2.2 of the Agreement to terminate it upon 30 days written notice (the "Termination Letter").  A true and correct copy of the Termination Letter is attached as **Exhibit 6**.

52.     Pursuant to the Termination Letter, Loverboy's termination of the Agreement became effective on January 1, 2021.

53.     Despite Loverboy's exercise of its express contractual right to terminate the Agreement and Night Shift's express contractual commitment in the Agreement to waive Night Shift's protections under Section 25E and promise not to enforce Section 25E against Loverboy, Night Shift has taken actions directly contrary to the terms of both the Agreement and its representations to Loverboy that induced it to enter into the Agreement.

54.     Specifically, Night Shift initiated proceedings before the Alcoholic Beverages Control Commission (the "ABCC"), with three (3) filings, improperly seeking statutory remedies, including those pursuant to Section 25E that Night Shift expressly waived in the Agreement (the "ABCC Actions").

27092836v.1

55.     By filing the ABCC Actions, Night Shift violated the Agreement and violated its representations and promises to Loverboy that it would waive any rights under Section 25E.

56.     By filing the ABCC Actions, Night Shift violated the Agreement and violated its representations and promises to Loverboy that it would not enforce any rights under Section 25E.

57.     By filing the ABCC Actions, Night Shift has created uncertainty across the Massachusetts market and blocked and/or delayed Loverboy from entering into new distribution relationships with distributors for the distribution of Loverboy's products across Massachusetts, contradicting what Night Shift promised it would do.

## COUNT I – FRAUD IN THE INDUCEMENT
(Night Shift Distributing, LLC)

58.     Loverboy repeats and incorporates by reference paragraphs 1 through 57, as if fully set forth herein.

59.     Night Shift through its statements directly to Loverboy and Loverboy's principals and control group and in Night Shift's various public statements and marketing materials, including wire communications like its website, made false statements of material facts concerning its intent not just to waive Section 25E's protections but also not to enforce key provisions of Massachusetts' laws governing alcohol manufacturers and other suppliers and distributors, including Section 25E.

60.     Night Shift knew or should have known that these statements were false when it made them and that it intended not to waive and instead to enforce zealously the Massachusetts alcohol franchise law, including Section 25E, if Loverboy dared to terminate the Agreement.

61.     Night Shift through its marketing efforts, including in public statements to the press and on its website, and its direct communications with Loverboy, made these false

27092836v.1

statements with the express purpose of inducing manufacturers and other suppliers, including Loverboy to act thereon.

62.     Loverboy reasonably relied on Night Shift's false statements both in the press and directly to it when making the decision to enter into the Agreement with Night Shift.

63.     Loverboy did in fact enter into the Agreement as a result of Night Shift's false statements and has been damaged as a result.

64.     Since terminating the Agreement with Night Shift, and due to Night Shift's improper actions, Loverboy has been hampered in making arrangements with new distributors to distribute and sell Loverboy's products across Massachusetts.

65.     As a direct and proximate result of Night Shift's wrongful conduct, Loverboy has been damaged in an amount to be determined at trial, but that is greater than $75,000, and is entitled to an order declaring the Agreement void *ab initio* as a result of Night Shift's fraudulent inducement.

## COUNT II – FRAUD
(Robert Burns)

66.     Loverboy repeats and incorporates by reference paragraphs 1 through 65, as if fully set forth herein.

67.     Burns, through his statements directly to Cooke and Califano and in his various public statements, made false statements of material facts concerning Night Shift's intent to waive Section 25E and not enforce key provisions of Massachusetts' alcohol franchise laws governing alcohol manufacturers and other suppliers and distributors, including Section 25E.

68.     Burns knew that these statements were false when he made them and that both he and Night Shift intended not to waive and instead to enforce zealously these Massachusetts alcohol franchise laws, including Section 25E if Loverboy dared to terminate the Agreement.

12

69.     Burns, through his statements to Cooke and Califano and through his public statements, made these false statements with the express purpose of inducing manufacturers and other suppliers, including Loverboy to act thereon.

70.     Burns, therefore, personally participated in these tortious acts of making false statements of material facts to Cooke and Califano with the purpose of inducing Loverboy to rely on them.

71.     Loverboy justifiably relied on the false statements made by Burns in the press and directly to Cooke and Califano when making the decision to enter into the Agreement with Night Shift.

72.     Because of these false statements made by Burns, Loverboy did in fact enter into the Agreement and has been damaged as a result.

73.     As a direct and proximate result of Burns' fraud, Loverboy has been damaged in an amount to be determined at trial that exceeds $75,000.

**COUNT III – BREACH OF CONTRACT (in the alternative to Count I)**
(Night Shift Distributing, LLC)

74.     Loverboy repeats and incorporates by reference paragraphs 1 through 57, as if fully set forth herein.

75.     The Agreement was a valid and binding contract between Loverboy and Night Shift.

76.     Night Shift breached its obligations under the Agreement in multiple ways.

77.     These breaches include, but are not necessarily limited to, failing to satisfy the obligations set forth in Sections 3.1, 3.2, and 3.3 of the Agreement.

78.     These breaches also include, but are not necessarily limited to, failing to comply with the express waiver provisions in Section 2.2 and Section 2.5 of the Agreement.

13

79.     Loverboy has been damaged as a result of Night Shift's breaches of the Agreement.

80.     As a direct and proximate result of Night Shift's breaches of the Agreement, Loverboy has been damaged in an amount to be determined at trial that exceeds $75,000.

### COUNT VI – Ch. 93A, § 11 Claim for Unfair and Deceptive Trade Practices
(Night Shift Distributing, LLC)

81.     Loverboy repeats and incorporates by reference paragraphs 1 through 73, as if fully set forth herein.

82.     Night Shift and Loverboy were both engaged in trade and/or commerce with alcoholic beverages in interstate commerce.

83.     Night Shift and Loverboy's distributor relationship was carried out in the ordinary course of both parties' business.

84.     Night Shift's knowingly false and fraudulent public statements and marketing materials to induce manufacturers and other suppliers, like Loverboy, into a distribution agreement with the intent to mislead Loverboy and other manufacturers and suppliers and breach those agreements by not waiving Section 25E and instead zealously enforcing Massachusetts' alcohol franchise laws constitute unfair and/or deceptive practices by Night Shift.

85.     Night Shift engaged in unfair and deceptive practices primarily and substantially in the Commonwealth of Massachusetts, where Night Shift's principal place of business is located.

86.     Loverboy has suffered a loss of money and property as a result of Night Shift's deceptive and unfair actions.

87.     As a result of Night Shift's actions in violation of Section 11, Loverboy is entitled to recover treble damages and an award of its reasonable attorneys' fees and costs in prosecuting this action.

88.     As a direct and proximate result of Night Shift's unfair trade practices, Loverboy has been damaged in an amount to be determined at trial, but that is greater than $75,000.

## DEMAND FOR RELIEF

WHEREFORE, Loverboy respectfully requests that the Court enter judgment on all counts against Night Shift and Burns, as follows:

A.     Award damages in an amount to be determined at trial;

B.     Award treble damages, pursuant to M.G.L. Ch. 93A, § 11;

C.     Declare the Agreement between Night Shift and Loverboy as void ab initio;

D.     Award pre- and post-judgment interest;

E.     Award attorneys' fees, pursuant to M.G.L. Ch. 93A, § 11A;

F.     Award costs; and

G.     Award all such other and further relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff Loverboy hereby demands a trial by jury on all claims and issues so triable.

**LOVERBOY INC.,**
By its Attorneys

**WHITE AND WILLIAMS LLP**

/s/ Timothy J. Keough
**TIMOTHY J. KEOUGH (BBO #691562)**
101 Arch Street, Suite 1930
Boston, MA 02110
Dated: May 7, 2021          617-748-5200
keought@whiteandwilliams.com