# DISTRIBUTION AGREEMENT

## SUMMARY PAGE

| | |
|---|---|
| Distributor: | Night Shift Distributing, LLC ("Distributor") |
| Company: | |
| Date: | |
| Exclusive Territory: | Massachusetts |
| Products Orders: | Products to be distributed will be listed on Schedule 1 and added throughout the term if agreed by Distributor. Purchase orders will be separately agreed upon by the parties and will be subject to terms of the Distribution Agreement. |
| Distribution: | Distributor will store and distribute the Products listed on Schedule 1 using its refrigerated warehouses and delivery trucks. All products shall be delivered to Distributor for distribution within 21 days of packaging and subject to quality and consistency checks. |
| Marketing: | Company will develop and provide sales and marketing strategies, programs, and activities for the Products. |
| Termination: | Either party may terminate the Distribution Agreement for any reason on 14 days' written notice during the first 180 days and on 90 days' notice thereafter, notwithstanding Section 25E of Chapter 138 of the Massachusetts General Laws. |
| Special Terms: | |

*The terms set forth in this Summary Page are intended for the convenience of the parties only, do not constitute a part of the Distribution Agreement between the parties, and are superseded in full by the terms of the Distribution Agreement. In the event of any conflict between the terms set forth in this Summary Page and those of the Distribution Agreement, the Distribution Agreement shall control.*

**DISTRIBUTION AGREEMENT**

This Distribution Agreement (this "Agreement") dated as of [DATE] (the "Effective Date"), is made by and between [COMPANY NAME] (the "Company") a [STATE ENTITY] with offices at [ADDRESS], and Night Shift Distributing, LLC, a Massachusetts limited liability company with offices at 87 Santilli Highway, Everett, MA 02149 (the "Distributor").

The Company is engaged in the business of producing, advertising, marketing, and selling the brands and products listed in the attached Schedule 1, as it may be amended from time to time, and all extensions thereof (the "Products"). The Company and Distributor desire that the Distributor act as the exclusive seller and distributor of the Products in the Commonwealth of Massachusetts (the "Territory").

The parties agree as follows:

1. **APPOINTMENT.**

    1.1   Territory. The Company represents and warrants that it is the manufacturer, or sole and exclusive United States importer for the Territory, of the Products. The Company hereby appoints the Distributor as its sole and exclusive distributor for the Products in the Territory, having the exclusive right to sell and distribute the Products in the Territory.

    1.2   Trademarks. The Company hereby grants to the Distributor the non-exclusive, non-assignable, non-transferable right to use the Company's trademarks, trade names, and trade dress (the "Trademarks") solely in connection with the distribution, marketing, and sale of the Products in the Territory. The Trademarks will remain the Company's sole and exclusive property.

2. **EFFECTIVE AND TERMINATION DATES**.

    2.1   Term. This Agreement will remain in effect from the Effective Date until terminated as provided herein.

    2.2   Termination by Either Party. Notwithstanding Section 25E of Chapter 138 of the Massachusetts General Laws ("Section 25E"), this Agreement may be terminated by either party at any time, without cause, upon 14 days' written notice if prior to the date 180 days after the Effective Date, and upon at least 90 days' written notice thereafter.

    2.3   Termination by Mutual Consent. This Agreement may be terminated at any time by mutual consent of the parties in writing effective as provided therein.

    2.4   Termination upon Default. This Agreement may be terminated by the non-defaulting party upon a default under Section 5.1 hereof.

    2.5   Effect of Termination. Upon a termination by the Company in accordance with this Section 2, the Company may refuse to sell any Products to the Distributor, notwithstanding Section 25E.  The Distributor waives any notice of discontinuance of sale requirement provided by Section

25E to the extent permitted by law.  If upon a termination by the Company in accordance with this Section 2, the Company chooses to file a notice of discontinuance of sale with the Massachusetts Alcoholic Beverages Control Commission (the "ABCC") pursuant to Section 25E, the Distributor agrees to not appeal to the ABCC for a hearing on such notice.  If the Distributor breaches the previous sentence and the ABCC enforces a continuing distribution relationship notwithstanding the terms of this Agreement, then the Distributor shall no longer be the sole and exclusive distributor for the Products in the Territory and any resulting distribution relationship shall be non-exclusive in the Territory unless otherwise agreed upon by the Company and the Distributor.

3. **THE DISTRIBUTOR'S OBLIGATIONS**.

    3.1     Territory Development. The Distributor will use commercially reasonable efforts to supply the Products to customers in the Territory, provided, however, that the Distributor will have sole discretion to allocate the Products as it determines based on its then-current accounts and to determine the locations to sell the Products.

    3.2     Marketing. The Distributor will use commercially reasonable efforts to execute reasonable marketing programs developed by the Company, if any.

    3.3     Handling Business. The Distributor will use commercially reasonable efforts to maintain a business organization and equipment reasonably sufficient to market and distribute the Products in the Territory.

    3.4     Inventory Quantities. The Distributor will use commercially reasonable efforts to maintain inventory quantities reasonably sufficient to fill the orders of its retail customers (subject to the Company's compliance with its obligations and ability to fill corresponding orders for Products received by the Distributor), but in no event will the Distributor be required to maintain an inventory quantity on any SKU of more than 30 days.

    3.5     Storage and Handling. The Distributor will use commercially reasonable efforts to maintain warehouse space in good condition and of sufficient capacity for packages and sizes of the Products to meet the demand of customers and to meet all Federal, state and local laws and regulations applicable to the Distributor. The Distributor will rotate inventory in its warehouse so that the Products are sold to customers on a first-in, first-out basis.  The Distributor intends to warehouse product in a refrigerated environment and deliver the Products in refrigerated delivery vehicles.

    3.6     Use of Trade Name or Trademarks. The Distributor will refrain from removing the Trademarks from Products, from using the Trademarks on any other product except the Products, and from using the Trademarks in the Distributor's corporate or business names without the Company's prior approval, provided, however, that nothing herein shall affect the Distributor's or its affiliates' rights to use their respective corporate or business names or brand names used in their ordinary course of business.

    3.7      Inspection. Upon reasonable notice, the Distributor will allow the Company to inspect the portions of the Distributor's facilities used for storage and distribution of the Products.

3

3.8     Depletion Reports. The Distributor will provide the Company with monthly depletion reports for the Products.

3.9     Quality Control. The Distributor will, at its own cost and expense, retrieve and destroy any out of code Products in its warehouse or located at its accounts in the Territory if such Products were sold by the Distributor. Out of code dates or timelines for each Product shall be set forth on Schedule 1. The Distributor shall have no obligation to accept Products from the Company beyond 21 days from the applicable packaging date.

3.10    Sales Out of Territory. The Distributor will not sell the Products to customers located outside the Territory.

4.  **THE COMPANY'S OBLIGATIONS**.

4.1     Sale of Products. The Company will promptly fill all orders for Products received from the Distributor. The Company will take all commercially reasonable steps, including discontinuing sales to infringing resellers, to protect the Distributor's exclusivity in the Territory and to prevent any person or entity other than the Distributor from directly or indirectly distributing, selling or marketing the Products in the Territory, or other beverages bearing the same or similar Trademarks or identification. The Company will promptly refer to the Distributor all leads, prospects, and related information that is directed to it or that it receives regarding potential purchasers of the Products within the Territory.

4.2     Shipping. The Company will make prompt shipments of the Products to the Distributor in accordance with the Distributor's purchase orders.

4.3     Inspection. The Company will use commercially reasonable efforts to avoid inconvenience to the Distributor or disruption of the Distributor's business when inspecting the Distributor's facilities.

4.4     Allocation of the Products. In times of short supply of the Products, the Company will allocate the Products fairly and equitably among its distributors, such that the Distributor will be allocated a percentage of its requirements for the Products commensurate with its reasonably projected sales volume as compared to all other distributors.

4.5     Company Responses. The Company will respond promptly in writing to the Distributor upon notification of a claim or action against the Company, the Distributor, or any customer for Products.

4.6     Sales and Marketing Support. The Company will develop marketing strategies, programs, and activities for the Products and furnish such information to the Distributor, including without limitation:

4.6.1    Providing the Distributor with pricing information, sales literature, technical assistance and sales training as needed, including suggested retail list prices for each of the Products (which shall in all cases be suggestions only and not binding upon the Distributor);

4.6.2    Developing sales, merchandising, and promotional material to support the development of the Products;

4.6.3    Assisting the Distributor in promoting sales of the Products, and helping build consumer acceptance for the Products;

4.6.4    Providing point-of-sale materials at no cost to the Distributor;

4.6.5    In its reasonable discretion and upon request of the Distributor, providing special support to the Distributor in endorsing special events, promotions, or public relation activities.

4.6.6    The Company shall appoint a representative for in-market sales and event support, where appropriate.

Notwithstanding anything in this Agreement to the contrary, should the Company wish the Distributor to contribute to the cost of any marketing program, the Company and the Distributor will make reasonable efforts to agree upon the amount to be spent in advance, but in no event will the Distributor be required to contribute to the cost of any marketing program.

4.7    Product Quality. The Company will maintain the premium quality of the Products, as determined by the Distributor in its sole discretion, and comply with all applicable Federal, state and local laws.  The Company is responsible for obtaining or maintaining any and all authorizations that may be required by any governmental entity in connection with the sale and distribution of the Products in the Territory and will furnish to the Distributor, promptly upon request, any and all such authorizations.  The Company represents, warrants, and covenants that all Products delivered to the Distributor shall, upon delivery, be merchantable premium beer products of first quality, suitable for beverage consumption, properly bottled, packaged, and labeled in conformity with applicable laws, regulations and requirements in effect within the territory, free from foreign matter (whether or not prejudicial to health), free of defects, and otherwise produced in accordance with the Company's specifications.  The Company shall not deliver Products to the Distributor beyond 21 days from the applicable packaging date.  The Company represents, warrants, and covenants that all Products delivered to the Distributor shall free of any liens and encumbrances.

4.8    Distributor Reimbursement. The Company will reimburse the Distributor for promotional program expenditures, samples, the Company's share of price discounts, depletion allowances, and all other types of reimbursable items, within 30 calendar days of receipt from the Distributor of the relevant supporting documentation, provided the Company has committed to such reimbursement in advance. The Distributor shall have the right to set off any reimbursement due against sums owed the Company for the Products or otherwise.

5. **DEFAULT**.

    5.1   <u>Default Defined</u>.  The following will be considered a default:

        5.1.1   A breach of this Agreement continuing beyond the cure period (if curable) after notice, as provided in Section 5.2.

        5.1.2   An assignment for the benefit of creditors; the institution of involuntary or voluntary proceedings under the United States Bankruptcy Code or state insolvency laws that is not dismissed within 90 days; or the appointment of a receiver or trustee, unless vacated within 90 days;

        5.1.3   Discontinuation of normal service to customers for a period of 60 consecutive days, other than if due to the actions or inactions of the non-breaching party.

    5.2   <u>Notice of Default</u>. Within 5 business days of receipt of a written notice of a legitimate default a party to this Agreement, the other party will commence to cure the default and inform non-defaulting party of the actions contemplated. Unless additional time is reasonably required, a default shall be cured within 30 days of receipt of such written notice.  Such notice shall describe the event or events constituting the default in reasonable detail, including a description and dates of each act or omission constituting the default and (if the default is susceptible to cure) the steps believed necessary to cure the default.

    5.3   <u>Remedies</u>. If the Distributor defaults, as described in Section 5.1, the Company shall have as its sole and exclusive remedy, the termination of this Agreement pursuant to Section 2.  If the Company defaults, as described in Section 5.1, the Distributor may at its option, terminate this Agreement, effective immediately, and exercise any other available remedies.

    5.4   <u>Effect of Termination</u>. Termination of this Agreement will not affect the obligation of the Company to make delivery on orders accepted prior to the effective date of termination, subject to the provisions of this Agreement. If this Agreement terminates, the Distributor may require the Company to repurchase all unsold Products in the Distributor's inventory, at Distributor's laid-in cost plus a 10% handling charge, with shipping to the Company's plant to be paid by the Company.  The Company will pay the Distributor for repurchased inventory within seven days of receipt.

    5.5   <u>The Distributor's Obligations Upon Termination</u>. Upon termination of this Agreement, the Distributor will immediately return to the Company at the Company's expense all advertising, promotional and sales materials in the Distributor's possession that were furnished by the Company without charge, including, without limitation, brochures, catalogs, price books, photographs, designs, drawings, and engineering and other data and, as soon as reasonably practicable, remove the Trademarks from the Distributor's vehicles and any of the Distributor's products, letterhead, business cards, and other promotional materials.

6.   **TERMS OF SALE OF THE PRODUCTS**.

6.1     <u>Price</u>.  The Company will sell the Products to the Distributor at its announced prices, which shall not be higher than its lowest price to any other wholesale distributor outside of the Territory. The Company may not increase its prices for the Products without giving the Distributor 60 days' prior written notice.

6.2     <u>Delivery/FOB</u>. The Products shall be sold FOB the Distributor's warehouse.

6.3     <u>Purchase Orders</u>. The Distributor's orders for the Products, and the Company's acceptances thereof, whether oral, written, or otherwise, will be subject to this Agreement. Any term or condition in purchase orders or acceptances that conflict with this Agreement shall be unenforceable unless such term or condition specifically provides otherwise in a writing signed by both parties.

6.4     <u>Payment</u>. The Distributor will pay for each shipment of the Products by check or wire within 30 calendar days after the receipt at the Distributor's warehouse, subject to a right of setoff of any sums due from the Company to the Distributor.

6.5     <u>Claims</u>. Any claims for shortages, damaged Products, or discrepancies in any shipment must be sent to the Company no later than 30 days after receipt of the shipment at the Distributor's facility. The Company will issue the Distributor a credit for claims that are approved, or notify the Distributor of disapproval and the reason for disapproval, within 15 days of receipt of the claim.

6.6     <u>Product Quality and Consistency</u>.  The Distributor may, in its sole discretion and using such methodologies as it determines, test and measure product quality, flaws, and consistency with prior batches of such Product or similar Products.  If the Distributor determines, in its sole discretion, that a Product's quality has diminished, or that it has ceased to be consisting with or substantially similar to prior batches of such Product, the Distributor may, in its sole discretion, refuse delivery of such Products, return such Products to the Company at the Company's expense, and/or discontinue its distribution of such Products.

7. **INDEMNIFICATION AND INSURANCE**.

    7.1    Indemnification by the Company. The Company will indemnify, defend, and hold harmless the Distributor, its affiliates and their respective equity holders, directors, officers, and employees (the "Indemnified Parties") from and against any and all losses, expenses, damages, claims, suits, demands, and causes of action, including, without limitation, reasonable fees and expenses of attorneys, court costs, and other litigation and dispute resolution costs, arising from or relating to any breach of this Agreement by the Company, or any injuries to or death of persons, or any damage to property, occurring as a result of, or in any way arising out of the sale, production, bottling, packaging, defects, or storage of the Products by the Company, including, without limitation, claims of breach of the warranty of the product's merchantability or fitness for purpose; claims related to the use or consumption of any Products sold to Distributor by the Company and from any impurity, adulteration, deterioration in any mishandling of any Products sold by the Company to Distributor; any actual or claimed infringement of any patent, trademark, copyright, or other intellectual property or proprietary rights by reason of the Products or any advertising or promotional materials created or supplied by the Company or any claims that the authorized use of Trademarks in accordance with the terms hereof infringes the intellectual property rights of another; claims of a breach by the Company of any of its representations, warranties or obligations set forth in this Agreement; and the enforcement of this indemnification.

    7.2    Notice; Defense by the Company. The Distributor will give the Company prompt written notice of any matter for which it claims indemnification, and if the matter involves a third-party claim, the Company may, if it elects, defend or settle the claim or suit at its own expense using counsel of its choosing, provided however that any settlement that does not provide for an unconditional release to the Distributor, or that includes granting equitable relief, will be subject to the approval of the Distributor in its sole discretion.  The Distributor will give the Company cooperation and any and all available information and assistance in the defense of such claim or suit, to the extent it is able without incurring additional cost.

    7.3    Company's Insurance. The Company will maintain primary and excess products liability coverage totaling at least $5,000,000 per occurrence, on an occurrence, and not a claims-made basis, and containing a Vendor's Liability Endorsement applicable to the Distributor, its affiliated companies, and all customers requesting such coverage through the Distributor. Within ten days of the effective date of this Agreement, the Company will provide to the Distributor an original certificate of insurance containing the terms and listing the Distributor as an additional insured, and thereafter will provide the Distributor with each certificate of renewal, within ten days of the effective date of renewal. Each certificate of insurance will contain an endorsement stating that the insurance company will give the Distributor at least thirty days' advance written notice of cancellation, nonrenewal, or material change in the terms of the liability policy.

8. **INTELLECTUAL PROPERTY INFRINGEMENT**.

    In the event of any infringement or claimed infringement of any patent, trademark, copyright, or other intellectual property or proprietary rights by reason of the Products or any advertising or promotional materials created or supplied by the Company, the Company, at its option and expense shall:

8.1     Secure for the Distributor the right to continue selling or distributing the Products, either by obtaining a license for such continued sale or distribution or by other appropriate means; or

8.2     Replace the Products with noninfringing products or parts thereof;

8.3     Modify the Products so as to render them noninfringing; or

8.4     Remove the Products from the Distributor's premises and refund the laid-in cost of the Products, plus a 10% handling charge within 15 days of removal.

9.     **MISCELLANEOUS**.

9.1     <u>Force Majeure</u>. Fires, floods, wars, acts of war, strikes, lockouts, labor disputes, accidents to machinery, delays or defaults of common carriers, orders, decrees or judgments of any court, circumstances outside the control of the Distributor, or any other contingency beyond the control of the Company or the Distributor, whether related or unrelated, or similar or dissimilar to any of the foregoing, will be sufficient excuse for any resulting delay or failure in the performance by either party of its respective obligations under the Agreement, but such performance will be excused only as long as the *force majeure* continues.

9.2     <u>Assignment</u>. The Distributor may assign this Agreement and any or all of its rights upon written notice to the Company, provided that the assignee agrees in writing to be bound by the terms of this Agreement, and the Company hereby consents to such assignment and agrees to maintain a manufacturer/wholesaler relationship with the assignee or any successor, pursuant to Massachusetts General Laws.

9.3     <u>Relationship of the Parties</u>. The relationship between the parties is that of independent contracting parties, as buyer and seller of goods, and not that of partners, joint venturers, or principal and agent. Neither party has or will hold itself out as having the authority to bind or act in the name of, or on behalf of, the other.

9.4     <u>Notices</u>. Any notice required by this Agreement will be sent by certified mail or nationally recognized overnight delivery service to the addresses set forth in the first paragraph hereof, unless a party gives written notice of a change of address, and will be effective upon receipt.

9.5     <u>Binding on Successors; Third Party Benefits</u>. This Agreement will bind and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Agreement will confer any benefits, rights or remedies upon any person or entity not a party hereto, except for the Indemnified Parties, who are explicitly made third-party beneficiaries hereof.

9.6     <u>Enforcement</u>. Failure of either party to enforce at any time any right or remedy it may have under this Agreement will not be a waiver of the provision or right, and will not preclude or prejudice the party from thereafter exercising the same or any other right or remedy it may have under this Agreement.

9.7     Governing Law; Jurisdiction; Jury Trial. This Agreement will be governed by, and interpreted and construed in accordance with, the internal laws of the Commonwealth of Massachusetts without reference to principles of conflicts or choice of law.  Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the Commonwealth of Massachusetts in each case located in the city of Boston and county of Suffolk, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

9.8     Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

9.9     Amendment. No change, modification, or alteration to this Agreement, or to the distribution relationship evidenced hereby will be effective unless set forth in writing and signed by both parties.

9.10    Entire Agreement. This Agreement supersedes all previous and contemporaneous agreements and understandings between the parties and is intended as the complete and exclusive statement of the terms of their understanding and agreement with respect to the subject matter hereof. There are no representations, oral or written, upon which the Company or the Distributor has relied as an inducement to enter into this Agreement, other than those set forth herein.

9.11    Product Recall. If any Products are recalled by Company, or if the Company discontinues selling any Products and requests the Distributor to retrieve the discontinued Products from the retail trade, the Distributor will return any unsold Products to the Company FOB within 45 days of receipt of the Company's recall or discontinuance notice. The Company will repurchase the Products from the Distributor, at the Distributor's warehouse, for the Distributor's laid in cost including any applicable state taxes plus a 15% handling charge.

9.12    Distributor's Business.  The Company acknowledges and understands that the Distributor and affiliates of the Distributor, including Night Shift Brewing, Inc. (collectively, "Night Shift"), engage in the business of producing, advertising, marketing, and selling alcohol beverages and activities ancillary thereto.  Nothing in this Agreement shall be construed, interpreted, or applied against Night Shift to prohibit, reduce, or otherwise restrict Night Shift from conducting or expanding its business activities as currently conducted or as may be conducted in the future in Night Shift's sole discretion.  The Company acknowledges and agrees that any sales of Night Shift products do not constitute unfair preferment in sales effort for brand names of a competitor, failure to exercise best efforts in promoting the sale of the Products, or improper or proscribed trade practices, and agrees to not make any claims of the foregoing with any court, tribunal, state commission, or other entity, body, or third person.

9.13	Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

9.14	Specific Performance. The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Distributor shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which its is entitled at law or in equity.

9.15	Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Distribution Agreement to be executed under seal as of the date first written above by their respective officers thereunto duly authorized.

**Distributor:**

NIGHT SHIFT DISTRIBUTING, LLC

_____
Name:
Title:

**Company:**

_____
Name:
Title:

Schedule 1

Products

The following products, individually, have been authorized to Distributor by this Agreement:

NAME(S) OF PRODUCT(S)                           OUT-OF-CODE TIME

The Distributor will be given thirty (30) days to accept or reject all future products and line extensions.