## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LOVERBOY INC.,<br><br>               Plaintiff,<br><br>v.<br><br>NIGHT SHIFT DISTRIBUTING, LLC,<br>and<br>ROBERT BURNS,<br><br>               Defendants. | Case No. 1:21-cv-10758-DPW |

### FIRST AMENDED COMPLAINT

Loverboy Inc. ("Loverboy"), by counsel and pursuant to Fed. R. Civ. P. 15(a)(1)(B), respectfully submits this First Amended Complaint against Defendants Night Shift Distributing, LLC ("Night Shift"), and its co-founder and President Robert Burns ("Burns"), seeking monetary damages, among other relief, for various acts of fraud by Night Shift and Burns. In support of its action, Loverboy alleges as follows:

### Introduction

1.      This is an action by Loverboy, a start-up supplier of alcoholic beverages for the growing sparkling beverage market, against Night Shift, an alcoholic beverages distribution company, and Burns its co-founder and President, arising out of their efforts to induce Loverboy and other small businesses, like Loverboy, into false, unfair, deceptive and exploitative distribution agreements.

2.      Night Shift and its principals, including Burns, carried out this scheme by marketing themselves as friendly to manufacturers and other suppliers, like Loverboy. As part of this scheme, Night Shift promised to waive a specific provision of the Massachusetts Liquor Control Act offering Night Shift protections under Massachusetts' alcohol franchise law, and to

more generally waive its rights, as they might exist, under Massachusetts' alcohol franchise laws governing alcoholic beverages distribution. But all the while, Night Shift and Burns intended instead to zealously enforce those laws to the detriment of Loverboy and other manufacturers and suppliers.

3.      Night Shift's and Burns' false, misleading, unfair, and deceptive practices in promising to waive the Massachusetts alcohol franchise law to induce Loverboy into a contractual relationship and then seeking to enforce those laws constitutes an unlawful bait and switch entitling Loverboy to damages, treble damages, and its attorneys' fees.

**The Parties**

4.      Plaintiff Loverboy Inc. is a Delaware corporation with its principal place of business in New York City.

5.      Night Shift Distributing, LLC, is a limited liability company organized under the laws of the Commonwealth of Massachusetts and with a principal place of business in Chelsea, Massachusetts.

6.      Robert Burns is a co-founder and the President of Night Shift.  Burns is a natural person domiciled in the Commonwealth of Massachusetts.

**Jurisdiction and Venue**

7.      The Court has subject matter jurisdiction over all claims pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000 and complete diversity exists between plaintiff and defendants.

8.      Alternatively, the Court also has jurisdiction over Count III under 28 U.S.C. § 1367(a), because that claim is so related to the other claims in this case that it forms part of the same case or controversy.

9.    The Court has personal jurisdiction over Defendant Night Shift on the basis that Night Shift is organized under the laws of the Commonwealth of Massachusetts and regularly transacts business in the Commonwealth of Massachusetts

10.    The Court has personal jurisdiction over Defendant Burns on the basis that Burns is domiciled in the Commonwealth of Massachusetts and engaged in the acts set forth herein in the Commonwealth of Massachusetts.

11.    Venue is appropriate according to 28 U.S.C. § 1391, as the defendants reside in this district and a substantial part of the events giving rise to the claims occurred in this district.

**The Distribution Agreement**

12.    Loverboy produces a line of alcoholic beverages that are carbonated drinks, including Loverboy Spritz cocktails and Loverboy Sparkling Hard Tea drinks.

13.    Loverboy's Chief Executive Officer and Founder is Kyle Cooke ("Cooke").

14.    Loverboy's Chief Operating Officer is Nicholas Califano ("Califano").

15.    On August 1, 2019, Night Shift transmitted its proposed form Distribution Agreement to Loverboy. *See* e-mail, with attachment, dated August 1, 2019, a copy of which is attached hereto as **Exhibit 1**.

16.    On or about October 8, 2019 (the "Effective Date"), Loverboy and Night Shift entered into a Distribution Agreement (the "Agreement") for Night Shift to distribute Loverboy's products in the Commonwealth of Massachusetts.  A true and correct copy of the Agreement is attached hereto as **Exhibit 2**.

17.    The value of the rights to distribute Loverboy's products in the Agreement are substantial and well in excess of $75,000.  For example, Night Shift has represented that sales of Loverboy's product constitutes more than 11% of Night Shift's total distribution business.

3

Additionally, Loverboy sold more than $2 million in Loverboy branded products to Night Shift in 2020.

18.     The Agreement was drafted by Night Shift.

19.     Section 9.10 in the final Agreement is identical to Section 9.10 in the form Distribution Agreement prepared by Night Shift and transmitted by Night Shift to Loverboy on August 1, 2019.  Section 9.10 was not the subject of specific negotiations between the parties.

20.     On the Effective Date, the Massachusetts Liquor Control Act ("LCA"), Massachusetts General Laws chapter 138, governed the lawful activities of Loverboy and Night Shift relative to the sale and other activities in Massachusetts with alcoholic beverages.  The LCA contains a provision that offers specified protections to Massachusetts licensed wholesalers/distributors of alcoholic beverages. Mass. Gen. Laws chapter 138, §25E.  In the beverage alcohol industry, this Section 25E is commonly referred to as the Massachusetts alcohol franchise law.

21.     The Massachusetts Supreme Judicial Court has described the impact of Section 25E as follows:

> G.L. c. 138, § 25E … makes it an  unfair trade practice for a manufacturer (or other supplier), absent good cause, to refuse to sell a brand of alcohol to a wholesaler if the manufacturer has made regular sales of such brand to the wholesaler during the preceding six-month period.[4]
> …
> FN 4.     General Laws c. 138, § 25E, provides as follows:  "It shall be an unfair trade practice and therefor[e] unlawful for any manufacturer, winegrower, farmer-brewer, importer or wholesaler of any alcoholic beverages, to refuse to sell, except for good cause shown, any item having a brand name to any licensed wholesaler to whom such manufacturer, winegrower, farmer-brewer, importer or wholesaler has made regular sales of such brand item during a period of six months preceding any refusal to sell.  Good cause as used herein shall be limited to the following conduct: (a)  disparagement of the product so as to impair the reputation of the brand owner or the brand name of any product, (b)  unfair preferment in sales effort for brand items of a competitor, (c)  failure to exercise best efforts in promoting the sale of any brand item, (d)  engaging in improper or proscribed trade practices, or (e)

4

failure to comply with the terms of sale agreed upon between supplier and wholesaler."

*Heublein, Inc. v. Capital Distribution Company, Inc.,* 434 Mass, 698, 699-700 (2001).

22.     The Massachusetts Appeals Court years ago acknowledged that Section 25E has been described as "protectionist" legislation, enacted, in part, "to redress economic imbalances in the relationship[s between] wholesalers and their suppliers." *Pastene Wine & Spirits Co. v. Alcoholic Bevs. Control Commn.,* 401 Mass 612, 618-619 (1988) (internal citations omitted); *Heineken U.S.A. v. Alcoholic Bevs. Control Comm'n*, 62 Mass. App. Ct. 567, 572 (2004);*see Seagram Distil. Co. v. Alcoholic Bevs. Control Commn.,* 401 Mass. 713, 716-717 (1988).  Obligations imposed by c. 138, s. 25E, are particular to a supplier. *See*, *Charles E. Gilman & Sons, Inc. v. Alcoholic Bevs. Control Commn.,* 61 Mass. App. Ct. 916, 917-918 (2004); *Brown-Forman Corporation v. Alcoholic Beverages Control Commission,* 65 Mass. App. Ct. 498, 499 (2006)

### Night Shift's Inducement of Loverboy

23.     Burns initiated an unsolicited first contact to Cooke by Instagram direct message on July 31, 2019, soliciting Loverboy's distribution business. *See* **Exhibit 3**.

24.     During a telephone discussion the following day, Burns, Cooke, and Califano discussed Night Shift's proposal to distribute Loverboy's products in Massachusetts (the "August 1 Phone Call").  During the August 1 Phone Call, Burns expressly stated that Night Shift would waive the application of Section 25E in its agreement to distribute Loverboy's products.

25.     This promised waiver of Section 25E was a central point of Burns' solicitation of Loverboy.  Indeed, Burns told Cooke and Califano during the August 1 Phone Call, "If you guys [Loverboy] outgrow us and you need to leave, no questions asked, just give us 30 days' notice and we'll chalk that up as a success."  During this same telephone conversation, Burns told Cooke and

Califano that Loverboy has "nothing to lose" by entering into a distribution agreement with Night Shift, since Loverboy would remain free to terminate Night Shift at any time, for any reason, without liability or compensation.

26.     Burns, Cooke, and Califano had additional telephone discussions on August 21, 2019 (the "August 21 Phone Call"), and between September 23, 2019 and September 29, 2019 (the "September Phone Calls").  During the August 21 Phone Call and the September Phone Calls, Burns reaffirmed Night Shift's agreement to waive Section 25E and its willingness to allow Loverboy to terminate the Agreement at any time, for any reason, without liability or compensation.

27.     The representations made by Burns and Night Shift on the August 1 Phone Call, the August 21 Phone Call, and the September Phone Calls were consistent with Cooke's and Califano's understanding of Burns' public statements about Section 25E and supplier-distributor relationships in Massachusetts.

28.     Loverboy made the decision to enter into the Agreement as the result of several direct conversations with Burns, including the August 1 Phone Call, the August 21 Phone Call, and the September Phone Calls.

29.     Indeed, Night Shift markets itself to new and developing manufacturers and other suppliers by promising not to enforce certain of the Massachusetts alcoholic beverages distribution laws governing the relationships between manufacturers and other suppliers and distributors, including Section 25E.

30.     For example, in a March 14, 2017 article on Bizjournals.com, it was reported that Night Shift does not lock manufacturers and other suppliers into long-term contracts and allows them to terminate simply by providing the agreed upon notice. The report also quoted Burns

referencing the growth of Night Shifts' business because of its "denouncing" the so-called Massachusetts alcohol franchise laws, specifically section 25E, and explaining the company's philosophy: Night Shift targets small, start-up and up-and-coming manufacturers and other suppliers for distribution agreements by offering freely terminable agreements ("I would definitely say NSB publicly denouncing the 25E franchise law has brought in these smaller brewers."). A true and correct copy of this article is attached as **Exhibit 4**.

31.     In the article, Burns went on to single out Section 25E specifically, and acknowledged the commercial impact of its waiver: "I would definitely say that [Night Shift] publicly denouncing the 25E franchise law has brought in these smaller brewers that wouldn't otherwise be comfortable selling beer in the state." (Ex. 4).

32.     Additionally, at a conference panel titled "Distribution Disruptors" in June 2017, Burns repeated this corporate mantra about not enforcing Massachusetts' so-called alcohol franchise laws in its relationships with suppliers, like Loverboy.  A video of this panel discussion is available to the general public via YouTube.[1]

33.     Among other things, Burns stated at the "Distribution Disruptors" conference that "if we [as a distributor] are not succeeding … or we change our vision or the brewery changes their vision, lets part ways amicably and move on," as opposed to requiring that suppliers comply with burdensome franchise laws like Section 25E. *See* Fn. 1, at 8:25 – 10:03.

34.     Also, at the "Distribution Disruptors" conference, Burns explained that a supplier should be able to terminate its distributor by providing notice and nothing more, stating that such a termination is "no different than if Whole Foods wants to stop buying Night Shift beer tomorrow."  *See* Fn. 1, at 43:25 – 43:50.

---

[1]          Panel, Distribution Disruptors (https://www.youtube.com/watch?v=NWvPsJ-2qzw).

35.    Likewise, on its website Night Shift markets itself to manufacturers and other suppliers with the promise that there are "[n]o lifetime contracts" and "archaic franchise laws will be ignored."  A true and correct screenshot of the Night Shift website from February 8, 2021 is attached as **Exhibit 5.**

36.    It was in this context that Burns told Cooke and Califano on the August 1 Phone Call, the August 21 Phone Call, and the September Phone Calls that any distribution agreement between Loverboy and Night Shift would include language waiving any and all of Night Shift's rights under Section 25E or rights to seek compensation for Loverboy's distribution rights.

37.    Because Night Shift and Burns' statements to Loverboy were consistent with Night Shift and Burns' prior statements, it was reasonable for Loverboy to rely on Night Shift and Burns' statements in August and September 2019.

38.    Loverboy would not have entered into the Agreement with Night Shift, but for Burns' and Night Shift's representations in, *inter alia*, the August 1 Phone Call, the August 21 Phone Call, and the September Phone Calls to waive the protections that might exist under Section 25E, not to enforce Section 25E against Loverboy, or seek compensation for Loverboy's distribution rights upon termination.

**Night Shift Failed To Provide Agreed Upon Services**

39.    During the term of the Agreement and prior to January 1, 2021, the effective date of Loverboy's termination, Night Shift failed to satisfy its obligations according to the Agreement in several ways.

40.    Night Shift failed to use commercially reasonable efforts to provide Loverboy products to customers in its territory in accordance with Section 3.1 of the Agreement.

8

41.     Night Shift failed to use commercially reasonable efforts to execute Loverboy's marketing programs in accordance with Section 3.2 of the Agreement.

42.     Night Shift failed to use commercially reasonable efforts to maintain a business organization and equipment reasonably sufficient to market and distribute Loverboy's products in its territory in accordance with Section 3.2 of the Agreement.

43.     Night Shift's failures included its strategy to deliver large volumes of Loverboy products to a small number of retail accounts.

44.     Many retailers who wanted to sell Loverboy products were unable to meet the unreasonably high minimum order requirements implemented by Night Shift.

45.     Many retailers who placed orders with Night Shift for Loverboy products were required to wait an unreasonable amount of time to receive deliveries; and when Night Shift eventually delivered Loverboy products to these retailers, it delivered unreasonably large orders.

46.     Night Shift failed to provide reasonable and customary service to retailers selling Loverboy products.

47.     Loverboy raised its concerns to Night Shift on many occasions.  On one such occasion, Night Shift's Brand Manager refused to reconsider Night Shift's distribution strategy for Loverboy products and explained Night Shift's position that it is not responsible for anything other than delivering product.

**Night Shift's Statements Prove to be False and Misleading**

48.     On or about November 25, 2020 and as a result of Night Shift's failure to perform under the Agreement, Loverboy transmitted a letter by e-mail to Night Shift and to Burns indicating its intent to terminate the Agreement.

9

49.     On or about December 1, 2020, Loverboy transmitted a termination notice via nationally recognized overnight delivery service to Night Shift exercising its rights under Section 2.2 of the Agreement to terminate it upon 30 days written notice (the "Termination Letter").  A true and correct copy of the Termination Letter is attached as **Exhibit 6**.

50.     Pursuant to the Termination Letter, Loverboy's termination of the Agreement became effective on January 1, 2021.

51.     Despite Loverboy's exercise of its express contractual right to terminate the Agreement and Night Shift's express contractual commitment in the Agreement to waive Night Shift's protections under Section 25E and promise not to enforce Section 25E against Loverboy, Night Shift has taken actions directly contrary to the terms of its representations to Loverboy that induced it to enter into the Agreement.

52.     Specifically, Night Shift initiated proceedings before the Alcoholic Beverages Control Commission (the "ABCC"), with three (3) filings, improperly seeking statutory remedies, including those pursuant to Section 25E that Night Shift expressly waived in the Agreement (the "ABCC Action").

53.     On January 13, 2021, Night Shift filed a "Petition for Relief from Supplier's Refusal to Sell Brands and Determination of Good Cause (G.L., c. 138, § 25e)" (the "Petition") in the ABCC Action.

54.     In its Petition, Night Shift sought injunctive and declaratory relief from the ABCC under Section 25E.  Additionally, at about the same time Night Shift was demanding compensation from Loverboy for its alleged distribution rights.

55.    Then, on January 21, 2021, Night Shift filed an amended petition with the ABCC captioned as its "Amended Petition for Relief from Supplier's Refusal to Sell Brands (G.L., c. 138, §25e, § 25e1/2)" (the "Amended Petition") in the ABCC Action.

56.    In the Amended Petition, Night Shift sought injunctive and declaratory relief under Section 25E and monetary compensation under Section 25E½.

57.    On March 1, 2021, Night Shift filed a second amended petition with the ABCC captioned as its "Second Amended Petition for Relief Pursuant to G.L., c 138, § 25E and § 25E ½" (the "Second Amended Petition") in the ABCC Action.

58.    In its Second Amended Petition, Night Shift sought, *inter alia*, monetary compensation for Loverboy's distribution rights.

59.    In its Petition, Amended Petition, and Second Amended Petition, Night Shift relied on Section 25E in its pleadings.

60.    On June 23, 2021, the ABCC issued its order dismissing the Second Amended Petition, because, despite Night Shift's arguments to the contrary, the ABCC concluded that Section 25E½ solely governed the allegations made by Night Shift.

61.    The ABCC's decision, over Night Shift's objection, however, does not negate or change Night Shift's intent concerning the filing of the ABCC Action or any of its pleadings therein.

62.    On July 7, 2021, Night Shift filed a Demand for Arbitration with the American Arbitration Association seeking compensation from Loverboy pursuant to Section 25E½ (the "Arbitration") for, *inter alia*, Loverboy's distribution rights.

63.     By filing the Petition, Amended Petition, Second Amended Petition, and the Arbitration, Night Shift violated its representations and promises to Loverboy that it would waive any rights under Section 25E.

64.     By filing the Petition, Amended Petition, Second Amended Petition, and the Arbitration Night Shift violated its representations and promises to Loverboy that it would not enforce any rights under Section 25E.

65.     By filing the Petition, Amended Petition, Second Amended Petition, and the Arbitration Night Shift violated its representations and promises to Loverboy that it would not seek compensation from Loverboy for its distribution rights if the Agreement was terminated.

66.     By filing the ABCC Actions, Night Shift has intentionally delayed Loverboy from entering into new relationships with distributors for the distribution of Loverboy's products across Massachusetts, contradicting what Night Shift promised it would do.

67.     As a result of Night Shift's tortious actions, Loverboy was not able to sell any Loverboy branded products in Massachusetts between January 2021 and May 2021.

**Night Shift and Burns' Intent to Mislead Loverboy**

68.     At a minimum, Night Shift and Burns knew that the statements made during the August 1 Phone Call, the August 21 Phone Call, and the September Phone Calls concerning termination of the Distribution Agreement were intentionally false when made.

69.     In a March 18, 2021 article published by Craft Business Daily concerning the dispute between Night Shift and Loverboy, Burns confirmed that his statements to Loverboy on the August 1 Phone Call, the August 21 Phone Call, and the September Phone Calls were intentionally false when he made them.

12

70.     Mr. Burns continued: "You don't need to write everything in a contract, when there's laws that help protect a wholesaler's right."  Any representation by Burns and Night Shift concerning their intent to ignore or waive Massachusetts' alcoholic franchise laws were, by Mr. Burns' own admission, intentionally false when made, because Night Shift always intended on relying on this protective legislation, including, *inter alia*, Section 25E.

71.     Indeed, unbeknownst to Loverboy, Night Shift and Burns had been aggressively lobbying for the passage of Section 25E½, which Night Shift and Burns knew would hinder Loverboy's, or any other manufacturer's, ability to terminate a distribution agreement with Night Shift without compensation.

72.     In the same article, Mr. Burns said that Night Shift "never agreed to zero" compensation for Loverboy's distribution rights.  This statement too confirms that Mr. Burns statements to Loverboy regarding not seeking compensation for its distribution rights were knowingly and intentionally false when made.

73.     Likewise, Mr. Burns' statements confirm that Section 9.10 of the Agreement was deliberately false and misleading when Mr. Burns signed the Agreement on behalf of Night Shift, because Night Shift always intended on relying on material that was extraneous to the Agreement.

74.     Night Shift continues to make false and misleading statements to potential distribution clients regarding its intent concerning Section 25E and other "archaic franchise laws."

75.     On July 2, 2021, Night Shift's website still advertised to potential distribution clients that "archaic franchise laws will be ignored."  *See* **Exhibit 7**.

76.     Despite this representation, Night Shift, through its counsel, has argued in three separate venues—including this one—that it is *unlawful* for it to contractually waive application of Section 25E in distribution agreements.

13

77.     On March 23, 2021, in its opposition to Loverboy's motion to dismiss the Second Amended Petition, Night Shift argued to the ABCC that "a contractual cancellation provision which is inconsistent with 25E is unenforceable."  On information and belief, Night Shift's website advertised to the public that it would ignore "archaic franchise laws" on March 23, 2021.

78.     Then, on June 15, 2021, in a filing with the Superior Court of Massachusetts, Night Shift asserted that, "[t]he ABCC has previously declared that a contractual provision that is inconstant with Section 25E is unenforceable."  On information and belief, Night Shift's website advertised to the public that it would ignore "archaic franchise laws" on June 15, 2021.

79.     Before this Court on June 25, 2021, Night Shift argued that "[t]here is existing case law suggesting that Section 25E cannot be waived."  Defendants' Memorandum in Support of Motion to Dismiss, at 19 (June 25, 2021) (ECF No. 12).  On information and belief, Night Shift's website advertised to the public that it would ignore "archaic franchise laws" on June 25, 2021.

80.     Night Shift and Burns therefore presently know that the statements on its website are intentionally false and misleading because they believe that it is unlawful for them to contractually waive Section 25E or any archaic provision of Massachusetts' franchise laws, and that they are made with the purpose of inducing beverage producers into entering distribution agreements.  To be clear, Night Shift's statements to these tribunals are not false or fraudulent, but it is Night Shift and Burns' statements to Loverboy and in marketing Night Shift to other manufacturers that are intentionally false and intended to induce reliance.

81.     Given this intentional and ongoing fraud by Night Shift and Burns concerning their actual motives regarding Massachusetts' franchise laws, i.e., that they never had any intention of waiving their rights under those laws, Night Shift and Burns knew that their statements in the

14

August 1 Phone Call, August 21 Phone Call, and September Phone Calls were intentionally false when made, as they continue to be today.

## COUNT I – FRAUD IN THE INDUCEMENT
### (Night Shift Distributing, LLC)

82.     Loverboy repeats and incorporates by reference paragraphs 1 through 81, as if fully set forth herein.

83.     Night Shift through its statements directly to Loverboy and Loverboy's principals and control group, including the August 1 Phone Call, the August 21 Phone Call, and the September Phone calls were false statements regarding Night Shift's intent to waive Section 25E's protections, intent not to enforce key provisions of Massachusetts' laws governing alcohol manufacturers and distributors, and intent not to seek compensation from Loverboy for its distribution rights.

84.     Night Shift knew or should have known that these statements were false when it made them and that it intended not to waive and instead to enforce zealously the Massachusetts alcohol franchise law, including Section 25E and Section 25E½, which it lobbied for and knew would become law, and seek compensation for Loverboy's distribution rights, if Loverboy dared to terminate the Agreement.

85.     Night Shift through its marketing efforts, including in public statements to the press and on its website, and its direct communications with Loverboy during the August 1 Phone Call, the August 21 Phone Call, and the September Phone Calls, made these false statements with the express purpose of inducing manufacturers and other suppliers, like Loverboy to act thereon.

86.     Loverboy reasonably relied on Night Shift's false statements both in the press and directly to it when making the decision to enter into the Agreement with Night Shift.

27459107v.1

87.     Loverboy did in fact enter into the Agreement as a result of Night Shift's intentionally false statements during the August 1 Phone Call, the August 21 Phone Call, and the September Phone Calls, and has been damaged as a result.

88.     Since terminating the Agreement with Night Shift, and due to Night Shift's improper actions, Loverboy was delayed in entering into any relationships with new distributors to distribute and sell Loverboy's products across Massachusetts.  As a result of these improper actions, Loverboy was not able to sell any Loverboy products in Massachusetts between January and May 2021.  These lost sales far exceed $75,000.

89.     As a direct and proximate result of Night Shift's wrongful conduct, therefore, Loverboy has been damaged in an amount to be determined at trial, but that is greater than $75,000, and is entitled to an order declaring Loverboy's transfer of its distribution rights to Night Shift void *ab initio* as a result of Night Shift's fraudulent inducement.

90.     The Court has subject matter jurisdiction over this claim under 28 U.S.C. § 1332, because, *inter alia*, the value of Loverboy's distribution rights exceeds $75,000 and the parties are completely diverse.  As alleged above, Night Shift purchased more than $2 million in Loverboy product in 2020 and, by its own admission, Loverboy's business amounts to 11% of its total distribution business, which, on information and belief, exceeds $75,000.

**COUNT II – FRAUD IN THE INDUCEMENT**
(Robert Burns)

91.     Loverboy repeats and incorporates by reference paragraphs 1 through 90, as if fully set forth herein.

92.     Burns, through his statements directly to Cooke and Califano and in his various public statements, made false statements of material facts concerning Night Shift's intent to waive

16

Section 25E and not enforce key provisions of Massachusetts' alcohol franchise laws governing alcohol manufacturers and other suppliers and distributors, including Section 25E.

93.     Burns knew that these statements were false when he made them and that both he and Night Shift intended not to waive and instead to enforce zealously these Massachusetts alcohol franchise laws, including Section 25E and Section 25E½, which he lobbied for and knew would become law, if Loverboy dared to terminate the Agreement.

94.     Burns, through his statements to Cooke and Califano and through his public statements, made these false statements with the express purpose of inducing manufacturers and other suppliers, including Loverboy to act thereon.

95.     Burns, therefore, personally participated in these tortious acts of making false statements of material facts to Cooke and Califano with the purpose of inducing Loverboy to rely on them.

96.     Loverboy justifiably relied on the false statements made by Burns directly to Cooke and Califano when making the decision to enter into the Agreement with Night Shift.

97.     Because of these false statements made by Burns, Loverboy did in fact enter into the Agreement and has been damaged as a result.

98.     Since terminating the Agreement with Night Shift, and due to Burns' improper actions, Loverboy was delayed in entering into any relationships with new distributors to distribute and sell Loverboy's products across Massachusetts.  As a result of these improper actions, Loverboy was not able to sell any Loverboy products in Massachusetts between January and May 2021.  These lost sales far exceed $75,000.

99.     As a direct and proximate result of Burns' wrongful conduct, therefore, Loverboy has been damaged in an amount to be determined at trial, but that is greater than $75,000, and is

entitled to an order declaring Loverboy's transfer of its distribution rights to Night Shift void *ab initio* as a result of Burns' fraudulent inducement.

100.     The Court has subject matter jurisdiction over this claim under 28 U.S.C. § 1332, because, *inter alia*, the value of Loverboy's distribution rights far exceeds $75,000 and the parties are completely diverse.  As alleged above, Night Shift purchased more than $2 million in Loverboy product in 2020 and, by its own admission, Loverboy's business amounts to 11% of its total distribution business, which, on information and belief, exceeds $75,000.

### COUNT III – Ch. 93A, § 11 Claim for Unfair and Deceptive Trade Practices
#### (Night Shift Distributing, LLC)

101.     Loverboy repeats and incorporates by reference paragraphs 1 through 100, as if fully set forth herein.

102.     Night Shift and Loverboy were both engaged in trade and/or commerce with alcoholic beverages in interstate commerce.

103.     Night Shift and Loverboy's distributor relationship was carried out in the ordinary course of both parties' business.

104.     Night Shift's knowingly false and fraudulent public statements and marketing materials concerning Massachusetts' franchise laws to induce manufacturers and other suppliers, like Loverboy, into a distribution agreement with the intent to mislead Loverboy and other manufacturers to enter into  those distribution agreements constitute unfair and/or deceptive practices by Night Shift.

105.     These knowingly false statements include, at least, Night Shift's conversations with Loverboy during the August 1 Phone Call, the August 21 Phone Call, and the September Phone Calls made with the purpose of fraudulently inducing Loverboy to enter into a distribution agreement.

27459107v.1

106.     Night Shift engaged in unfair and deceptive practices primarily and substantially in the Commonwealth of Massachusetts, where Night Shift's principal place of business is located.

107.     Loverboy has suffered a loss of money and property as a result of Night Shift's deceptive and unfair actions, including an inability to sell Loverboy branded products in Massachusetts between January and May 2021.  These damages far exceed $75,000.

108.     As a result of Night Shift's actions in violation of Section 11, Loverboy is entitled to recover treble damages and an award of its reasonable attorneys' fees and costs in prosecuting this action.

109.     As a direct and proximate result of Night Shift's unfair trade practices, Loverboy has been damaged in an amount to be determined at trial, but that is greater than $75,000.

110.     Accordingly, the Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. § 1332, because, *inter alia*, the amount in controversy exceeds $75,000 and the parties are completely diverse.  Alternatively, the Court has subject matter jurisdiction over this claim under 28 U.S.C. § 1367, because the facts underlying this claim form the same case or controversy as Count I of this Amended Complaint.

### COUNT IV – Tortious Interference with Prospective Economic Advantage
(Night Shift Distributing, LLC)

111.     Loverboy repeats and incorporates by reference paragraphs 1 through 110, as if fully set forth herein.

112.     Following Loverboy's notice of termination of the Agreement, Loverboy was in discussions with other distributors to sell Loverboy's products in Massachusetts.

113.     Specifically, Loverboy was in advanced discussions with Quality Beverage, Inc. to distribute Loverboy's products in Massachusetts.  Loverboy had a reasonable expectation that it

19

would enter into a distribution agreement with Quality based on the advanced nature of those discussions.

114.   Night Shift and Burns had actual knowledge of Loverboy's discussions with Quality and its anticipated business relationship with Quality.

115.   Following notice of Loverboy's intention to terminate the Agreement, Burns, on behalf of Loverboy, had at least one conversation with a representative from Quality demanding eight times of Loverboy's annual sales in exchange for Loverboy's distribution rights.

116.   Burns made these statements with the intent to interfere with Loverboy's prospective business relationships with other distributors for an improper purpose and by improper means.

117.   Burns made these statements with an improper purpose, because he made the statements for spite and out of ill will as a result of Loverboy's decision to terminate the Agreement after thirteen months and before Section 25E½ became law.  Further, Burns knew that other distributors would become aware of his demands and that they too would be unwilling to do business with Loverboy, which was the intended goal of his willful and spiteful statements.

118.   Likewise, Burns used improper means to interfere in Loverboy's prospective business relationships because he knew that he had no basis to demand any compensation from any distributor for Loverboy's distribution rights.  Burns' assertion to Quality that Night Shift was entitled to compensation was, therefore, intentionally deceitful and fraudulent.

119.   Loverboy has been damaged as a result of Night Shift's intentional interference, because it was unable to sell Loverboy branded product in Massachusetts for several months, resulting in damages far exceeding $75,000.  For example, Quality estimated monthly purchases

from Loverboy of approximately 10,000 cases of Loverboy products per month from January through May.

120.    Accordingly, the Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000 and the parties are completely diverse.

### COUNT V – Breach of Contract (in the alternative to Counts I-III)
(Night Shift Distributing, LLC)

121.    Loverboy repeats and incorporates by reference paragraphs 1 through 81, as if fully set forth herein.

122.    The Agreement created contractual obligations between Night Shift and Loverboy as of the Effective Date.

123.    Section 2.2 of the Agreement states that either part could terminate for any reason, provided it gave timely notice to the other party: "Notwithstanding Section 25E of Chapter 138 of the Massachusetts General Laws…, this Agreement may be terminated by either party at any time, without cause, upon 14 days' written notice if prior to the date 180 days after the Effective Date, and upon at least 30 days' written notice thereafter."

124.    Further, Section 2.5 of the Agreement regarding the "Effect of Termination" states:

Upon a termination by the Company in accordance with this Section 2, the Company may refuse to sell any Products to the Distributor, notwithstanding Section 25E. The Distributor waives any notice of discontinuance of sale requirement provided by Section 25E to the extent permitted by law. If upon a termination by the Company in accordance with this Section 2, the Company chooses to file a notice of discontinuance of sale with the Massachusetts Alcoholic Beverages Control Commission (the "ABCC") pursuant to Section 25E, the Distributor agrees to not appeal to the ABCC for a hearing on such notice. If the Distributor breaches the previous sentence and the ABCC enforces a continuing distribution relationship notwithstanding the terms of this Agreement, then the Distributor shall no longer be the sole and exclusive distributor for the Products in the Territory and any resulting distribution relationship shall be non-exclusive in the Territory unless otherwise agreed upon by the Company and the Distributor.

21

125.     Night Shift breached, *inter alia*, Sections 2.2 and 2.5 of Agreement by filing the ABCC Action and attempting to delay, hinder, and/or prevent Loverboy's otherwise proper termination of the Agreement.

126.     Loverboy has been damaged as a result of Night Shift's breach.

127.     Specifically, Loverboy has incurred fees and costs associated with the ABCC Action that were the result of Night Shift's breaches and also lost profits from Night Shift's delay in permitting an orderly and proper termination.

128.     The Agreement also includes a clause that purports to limit Night Shift's liability in the event of a breach of the Agreement.

129.     Specifically, section 5.3 of the Agreement states: "If the Distributor defaults, as described in Section 5.1, the Company shall have is its sole and exclusive remedy, the termination of the Agreement pursuant to Section 2.  If the Company defaults, as described in Section 5.1, the Distributor may at its option, terminate the Agreement, effective immediately, and exercise any other available remedies."  (the "Limitation of Liability Clause").

130.     The Limitation of Liability Clause is unenforceable because it is unconscionable and/or contrary to public policy.

131.     The Limitation of Liability Clause is substantively unconscionable because it eliminates any meaningful remedy from Loverboy resulting from a breach by Night Shift concerning termination of the Agreement, while reserving to Night Shift its full panoply of remedies available under Massachusetts law.

132.     The Limitation of Liability Clause is procedurally unconscionable, because Night Shift was deceitful and dishonest during negotiation of the Agreement.  At the time the Agreement was negotiated and executed, it knew or should have known that its promises concerning

22

Loverboy's ability to exercise its rights under Section 2.2 of the Agreement were purposefully and intentionally false.

133.    Night Shift, therefore, knew that Loverboy would have no meaningful remedy available to it concerning a breach of Sections 2.2 and/or 2.5 of the Agreement.

134.    Likewise, the Limitation of Liability Clause is contrary to public policy to the extent it seeks to protect Night Shift from its own intentional or grossly negligent acts. Specifically, Night Shift knew at the time that it was executing the Agreement that it was making a false promise, failing to disclose material facts to Loverboy, and intended to violate any contractual promises it made to Loverboy.

135.    The Limitation of Liability Clause is unenforceable as contrary to public policy, to the extent it seeks to protect Night Shift from liability for these intentional and grossly negligent acts.

136.    Accordingly, Night Shift is responsible for the damages it has suffered as a result of its breach of the Agreement, including the fees and costs associated with defending against the improperly filed ABCC Action and the lost profits from being unable to sell its products in Massachusetts from January 2021 through May 2021.  These combined damages exceed $75,000.

137.    The Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000 and the parties are completely diverse.

**DEMAND FOR RELIEF**

WHEREFORE, Loverboy respectfully requests that the Court enter judgment on all counts against Night Shift and Burns, as follows:

A.     Award damages in an amount to be determined at trial;

B.     Award treble damages, pursuant to M.G.L. Ch. 93A, § 11;

23

C.     Declare Loverboy's transfer of its distribution rights to Night Shift void *ab initio*

as a result of Night Shift's fraudulent inducement;

D.     Award pre- and post-judgment interest;

E.     Award attorneys' fees, pursuant to M.G.L. Ch. 93A, § 11A;

F.     Award costs; and

G.     Award all such other and further relief as the Court deems just and appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff Loverboy hereby demands a trial by jury on all claims and issues so triable.

Dated: July 16, 2021

Respectfully submitted,

LOVERBOY INC.

By its attorneys,

**WHITE AND WILLIAMS LLP**
/s/ Timothy J. Keough
Timothy J. Keough  (BBO #691562)
101 Arch Street, Suite 1930
Boston, MA 02110
Tele: 617-748-5200
keought@whiteandwilliams.com

24

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document, filed through the Court's ECF system on July 16, 2021, will be sent electronically to the registered counsel of record in this case as identified in the Notice of Electronic Filing, and paper copies will be sent to all non-registered participants.

　/s/ Timothy J. Keough　　　　　　
Timothy J. Keough

27459107v.1